UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOAN LEBOUEF | CIVIL ACTION |
| VERSUS | No. 22-1523 |
| EVONIK CORPORATION, ET AL. | SECTION: "J"(3) |

### ORDER & REASONS

Before the Court are two *Motions to Dismiss for Failure to State a Claim* **(Rec. Docs. 4, 12)** filed respectively by Defendants, Shell Oil Company ("Shell") and Evonik Corporation ("Evonik"; collectively, with Shell, "Defendants") and oppositions (Rec. Docs. 8, 13) filed by Plaintiff, Joan LeBouef ("Plaintiff"). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that both motions should be **DENIED.**

### FACTS AND PROCEDURAL BACKGROUND

This case arises out of alleged exposure to ethylene oxide ("EtO") near a petrochemical plant located in Reserve, Louisiana ("the facility"), owned and operated by Defendants, Evonik and Shell. Shell owned and operated the facility from 1991 until 1999, and Evonik has owned and operated the facility since that time. Plaintiff is a sixty-six-year-old woman, who resides within three miles of the facility. She was diagnosed with breast cancer on June 2, 2010, allegedly caused by years of exposure to EtO emitted by the facility. EtO is a colorless, odorless toxic emission that is a well-known carcinogen.

Originally, this suit consisted of fourteen plaintiffs who all were Louisiana residents who live within seven miles of the facility, and who either contracted cancer, or had a spouse die from cancer, allegedly because of unknowing exposure to dangerous levels of EtO emitted by the facility. On April 26, 2021, the original plaintiffs filed suit in the Civil District Court for the Parish of St. John the Baptist, alleging that inhalation of EtO emitted from the facility was a substantial factor in causing plaintiffs', or their spouses', cancer. On June 4, 2021, Evonik removed the case to federal court, and it was allotted to Judge Sarah Vance.

On November 5, and 9, 2021, respectively, defendants Shell and Evonik filed motions to dismiss the original plaintiffs' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Both movants contended that plaintiffs' claims against them were time-barred, because suit was filed beyond expiration of the one-year prescriptive period. Defendants additionally asserted that the claims must be dismissed on the merits, because the plaintiffs did not state a claim for negligence, battery, or nuisance under Louisiana law.

On May 27, 2022, Judge Vance granted Shell's motion to dismiss without prejudice on the grounds of prescription and the non-applicability of *contra non valentem* and granted plaintiffs leave to amend their complaint to plead facts, specific to each plaintiff, to support the application of *contra non valentem* after their dates of diagnoses. Moreover, Judge Vance found that the plaintiffs had not stated a claim for negligence under Louisiana law, because they had no specific standard of care with which Evonik and Shell ought to have complied. Judge Vance granted in part

2

Evonik's motion to dismiss without prejudice and granted plaintiffs leave to amend their negligence allegations to articulate a specific duty of standard of care that the defendants are alleged to have breached. Finally, Judge Vance severed the plaintiffs into fourteen distinct civil actions.

Plaintiff's, Joan LeBouef's, case was allotted to this Court. She subsequently filed an amended complaint pursuant to Judge Vance's Order & Reasons, and Shell and Evonik filed the instant motions to dismiss the amended complaint for failure to state a claim.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "'conclusory allegations or legal conclusions masquerading as factual

conclusions will not suffice to prevent a motion to dismiss.'" *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## DISCUSSION

The three main questions before the court are 1) whether Plaintiff's claims are prescribed, 2) whether Plaintiff's amended general negligence allegations articulate a specific standard of care and breach of that standard, and 3) whether Plaintiff properly stated a claim under Articles 667-669.

### I. Prescription

First, Evonik contends that Plaintiffs' claims are time-barred by Louisiana's one-year prescriptive period applicable to delictual actions. (Rec. Doc. 12-1, at 1).[1] In opposition, Plaintiff argues that the prescriptive period was suspended under the doctrine of *contra non valentem*, and hence, her claims are not prescribed. (Rec. Doc. 13, at 5).

Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year." La. Civ. Code art. 3492. This period "commences to run from the day injury or damage is sustained." *Id.*; *see also Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting La. Civ. Code art. 3492). "Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual

---

[1] It is telling that Shell chose to not challenge the timeliness of Plaintiff's claims nor applicability of *contra non valentem*. In fact, in one of her former co-plaintiff's case, Shell uses Plaintiff's case as a comparative example of when *contra non valentem* applies. Shell compares the former co-plaintiff, Mr. Jack, who includes no allegations of communications with his doctor, with Plaintiff in this case, who "discussed a potential cause of cancer with her physician and, after genetic testing, he told her it was not caused by genetics. However, her physician did not offer any other possible explanations despite her inquiries." *Jack v. Evonik Corp. et al.*, No. 22-1520, Rec. Doc. 12-1, at 9 n. 33.

4

of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993) (citing *McCray v. N.E. Ins. Co.*, 579 So. 2d 1156 (La. App. 2 Cir. 1991)).

Here, Plaintiff filed suit on April 26, 2021, which makes April 26, 2020 the cutoff date required to render this suit timely. (Rec. Doc. 4-1, at 1). Plaintiff was diagnosed with breast cancer on June 2, 2010, which significantly predates the cutoff date. Accordingly, unless the one-year period was suspended or another exception applies, all of Plaintiff's claims are prescribed. Plaintiff does not dispute this proposition, but she argues that the prescriptive period was suspended under the doctrine of *contra non valentem*. (Rec. Docs. 8, at 4; 13, at 5).

Under Louisiana law, *contra non valentem* is a doctrine that tolls the statute of limitations and is thus "an exception to the general rules of prescription." *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994). This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. *Renfroe v. State ex rel. Dept. of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002). But this exception, sometimes known as the "discovery rule," is available only in "exceptional circumstances." *Meggs v. Davis Mortuary Serv., Inc.*, 301 So. 3d 1208, 1213 (La. App. 5 Cir. 2020) (quoting *Renfroe*, 809 So. 2d at 953). Courts assessing the applicability of contra non valentem must focus on the reasonableness of the tort victim's action or inaction. *See Griffin v. Kinberger*, 507 So. 2d 821, 824 n.2 (La. 1987). As the Louisiana Supreme Court has explained:

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be

5

> used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. *On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.*

*Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (emphasis added).

The law is clear that the prescriptive period begins to run once a party has "constructive knowledge . . . of the facts that would entitle him to bring a suit," even if he does not have actual knowledge of those facts. *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510–11. "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription." *Id.* at 511 (citations omitted); *see also Meggs*, 301 So. 3d at 1213 ("If the plaintiff could have discovered the cause of action by exercising reasonable diligence, the doctrine will not prevent the running of prescription." (citations omitted)); *Miles v. MEMC Pasadena, Inc.*, 2009 U.S. Dist. LEXIS 39069, at *3 (E.D. La. May 8, 2009) ("The plaintiff must show that the cause of action for his injuries was not reasonably knowable. This is a heavy burden."). The discovery rule provides that, for prescription to run, a plaintiff must have actual or constructive notice of the "tortious act, the damage caused by the tortious act, and the causal link between the act and the damage." *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992) (citing *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139 (5th Cir. 1987)).

The question here is whether Plaintiff's cancer diagnosis put her "on guard and call[ed] for inquiry," such that she had constructive knowledge of her cause of action

against Evonik. If she had constructive knowledge as of the date of her diagnosis, then prescription was triggered and *contra non valentem* does not save her otherwise untimely claims. Therefore, the Court must determine whether a medical diagnosis, standing alone, constitutes constructive knowledge and triggers a duty to investigate.

State and federal case law regarding prescription and *contra non valentem* strongly suggest that a medical diagnosis puts a plaintiff on constructive notice of her cause of action, and thereby starts the prescriptive period. *Tenorio v. Exxon Mobil Corp.*, 170 So. 3d 269, 275 (La. App. 5 Cir. 2015) ("Although [plaintiff] claims to not have had knowledge of the radiation exposure at Alpha Tech, the commencement of prescription began when he should have discovered the facts upon which his cause of action was based, which was [when he was diagnosed with cancer] in November 2009."); *Lennie v. Exxon Mobil Corp*, 251 So. 3d 637, 648 (La. App. 5 Cir. 2018) (holding decedent's "diagnosis of lung cancer in January 2010 was constructive notice sufficient to put [the plaintiffs] on guard and to call for them to inquire further into the cause of his condition."); *Guerin v. Travelers Indem. Co.*, 296 So. 3d 625, 631 (La. App. 1 Cir. 2020) ("[Plaintiff's] inaction was not reasonable in light of the knowledge that he possessed, and that his diagnosis in 2015 was constructive notice sufficient to put him on guard and to call him to inquire into the cause of his condition.").

The Fifth Circuit recently considered the above-cited trio of cases and emphasized the significance of a medical diagnosis in starting a plaintiff's prescriptive period. *See Butler v. Denka Performance Elastomer, LLC*, 16 F.4th 427, 439-40 (5th Cir. 2021). In *Butler*, the plaintiff alleged various health conditions

7

resulting from chloroprene emissions from a nearby neoprene plant. *Id.* at 432. In holding that the plaintiff had adequately alleged *contra non valentem* at the pleadings stage, the court distinguished *Tenorio*, *Lennie*, and *Guerin*, as cases in which "a plaintiff's diagnosis, more than one year prior to filing suit, constitute[d] constructive notice." *Id.* at 440 (emphasis in original). The court stated that this "diagnosis" distinction is "critical," and that, because the *Butler* plaintiff "was not diagnosed or otherwise told that her symptoms were a result of excessive chloroprene emissions more than one year prior to filing suit," she was able to rely on *contra non valentem* at the pleadings stage. *Id.*

Bearing these cases in mind, Judge Vance found plaintiffs' original complaint was prescribed on its face. The cancer diagnoses spanned from 1999 to April 6, 2020. But despite that the diagnoses gave the plaintiffs "constructive notice sufficient to put [them] on guard and to call [them] to inquire into the cause of [their] condition[s]," *Guerin*, 296 So. 3d at 631, their pleadings contained no allegations about what specific actions they took to investigate or otherwise inquire about the causes of their cancers, which could justify the application of *contra non valentem*.

After Plaintiff's claims were severed and her case was allotted to this section, Plaintiff heeded Judge Vance's order and added a number of allegations to support a finding of *contra non valentem*. First, Plaintiff investigated the cause of her illness. *See Miles*, 2009 U.S. Dist. LEXIS 39069, at *4 (applying *contra non valentem* when plaintiff investigated cause and asked his doctor if his kidney condition was the result

8

of a chemical exposure accident at work); *see also Young v. Clement*, 367 So. 2d 828, 829-30 (La. 1979). Specifically, Plaintiff alleges:

> She discussed a potential cause of cancer with her physician and, after genetic testing, he told her it was not caused by genetics. However, her physician did not offer any other possible explanations despite her inquiries. No physician ever advised Plaintiff that Plaintiff's cancer may have been caused by exposure to EtO so as to reasonably put Plaintiff on notice of her cause of action against Defendants. Plaintiff did not know anything about EtO to ask the physicians any questions about her exposure, which was also unknown to her at the time, and cancer.

(Rec. Doc. 2-1, at 12). These allegations are significant. Plaintiff asked her physicians questions to inquire how she contracted breast cancer, but they provided no answers. Even after she underwent genetic testing to find the cause of her illness, the physicians still gave her no answer besides the fact her cancer was not caused by genetics.

Second, Plaintiff alleges facts that make the inaction between her initial inquiries and the later advertisement from the Voorhies Law Firm reasonable. Plaintiff explains:

> Plaintiff did not have any reasonable access to or knowledge of the body of industry and scientific information regarding the dangers of EtO. Nor did she know about the 2014 NATA results, as those results were not widely publicized to lay persons in the communities around the facility until after this suit was filed.
>
> . . . Plaintiff did not know how to research information related to operation of the facility. The first time Plaintiff had any reason to think that EtO emission from the facility was a substantial factor in causing Plaintiff's cancer was when Plaintiff received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. That the facility emitted EtO was not common knowledge among lay persons in the community and was never discussed or brought to Mr. Plaintiff's attention prior to receiving the mailer. The receipt of the advertisement was the first time Plaintiff ever knew of the existence of EtO and in her own words "opened her eyes" for the first time about a potential

9

> cause of her cancer . . . Thereafter Plaintiff took reasonable steps to investigate whether exposure to EtO had caused Plaintiff's cancer or created a risk of future health problems. Plaintiff filed this action within one year of learning facts supporting that she had a cause of action against Defendants.

(Rec. Doc. 2-1, at 12-13). Although the information about EtO-related cancer risks was not entirely unknown or unavailable, at the time of her diagnosis, the amended complaint's allegations show that such information was not easily accessible to lay persons. Surely, if the local doctors did not know the nearby facility was causing cancer in the community, a lay person should not be expected to know. Moreover, Plaintiff only attended high school to the eleventh grade up to the level of chemistry, which enhances the technical, equivocal character of the facts regarding EtO. (Rec. Doc. 2-1, at 13); *see Lennie*, 251 So. 3d at 645 (noting "ultimate issue is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of defendant's conduct") (citations omitted)); *see Ducre v. Mine Safety Appliances*, 963 F.2d 757, 761 (5th Cir. 1992) (applying *contra non valentem* for plaintiff who left school after finishing tenth grade, and noting "equivocal character of facts known by [plaintiff] is enhanced by [his] limited education").

For these reasons, the Court finds that *contra non valentem* applies in this case, and therefore, Plaintiff's claims are not prescribed.

## II. Negligence

### A. Duty

Plaintiff alleges that Defendants are liable for negligence, and the parties' key dispute focuses on whether Plaintiff has adequately alleged a duty owed by

10

Defendants. Under article 2315 of the Louisiana Civil Code, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A). Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006). Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633.

In *Butler v. Denka Performance Elastomer, LLC*, the Fifth Circuit considered plaintiff's appeal of the district court's dismissal of her claims arising from allegedly unsafe emissions of chloroprene in the community. 16 F.4th at 432. As to whether plaintiff had adequately alleged a duty under Louisiana law, the court explained:

> Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another." *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1086 (La. 2009). She says Denka's chloroprene emissions—untethered from any particular emissions threshold — are nonetheless unreasonably excessive . . .
>
> Butler's retreat to generalized grievances is unavailing. While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care. *See Lemann*, 923 So. 2d at 633. The inquiry into a defendant's particular duty "is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.*; *accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law") . . .

11

> Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." Yet, Butler points to no "statutory," "jurisprudential," or any other source of law—and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence . . . claim. *See Bd. Of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 727-28 (5th Cir. 2017) (dismissing negligence [claim] . . . because plaintiffs failed to allege an applicable legal duty under the federal and state statutory and regulatory schemes . . . ).

*Butler*, 16 F.4th at 443-46.

In the original plaintiffs' case, Judge Vance found that plaintiffs' complaint cited no cognizable source or articulation of the duty alleged. The original plaintiffs instead rested on the notion that Evonik had a broad duty to exercise "ordinary care," to "avoid an unreasonable risk of harm to persons located in the surrounding areas," and to "reduce emissions to a level that do[es] not pose an unreasonable risk of harm." But plaintiffs went no further. They failed to specify a "specific standard" of care with which Evonik should have complied. *See Lemann*, 923 So. 2d at 633. Thus, Judge Vance dismissed the negligence claims without prejudice, granting plaintiffs leave to amend their complaint to allege a specific duty.

In amending her complaint, Plaintiff in this case forewent the generalized pronouncements that Defendants had a duty to exercise "ordinary care" to not emit "excessive emissions" that posed an "unreasonable risk." Rather, her amended complaint now alleges that Defendants have a duty to conform to the standard of care set forth in the Environmental Protection Agency ("EPA") approved state operating permit program, which is administered by the Louisiana Department of

12

Environmental Quality ("LDEQ"), and is set forth in the Louisiana Administrative Code Title 33, Part III. Specifically, the amended complaint alleges:

> Pursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at 'point sources' where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Emission controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards.

(Rec. Doc. 2, at 10-11 (citing 33 La. Admin. Code Pt. III, § 905,[2] § 2121[3])).

Both Shell and Evonik maintain that Plaintiff still has failed to articulate a specific duty in her amended complaint. (Rec. Docs. 4, at 1; 12-1, at 11-12). Shell argues that the amended complaint contains contradictory facts (like the allegation that the emissions are state-authorized amounts) and lacks allegations that Shell failed to abide by permits or failed to install pollution controls. Because of these factual contradictions and omissions, Shell believes Plaintiff failed to articulate a specific standard of care. However, these factual issues are pertinent to breach, not duty. *See Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 539 (5th Cir. 2015) ("Whether a duty exists is a question of law to be decided by the court; whether a duty is breached is a question of fact."). Shell's contentions focus its actions taken in relation to duty, or in other words, whether it breached the standard of care set

---

[2] L.A.C. 33:III.905(a) provides, "Except as provided in Subsection B of this Section, to aid in controlling the overall levels of air contaminants into the atmosphere, air pollution control facilities should be installed whenever practically, economically, and technologically feasible. When facilities have been installed on a property, they shall be used and diligently maintained in proper working order whenever any emissions are being made which can be controlled by the facilities, even though the ambient air quality standards in affected areas are not exceeded."

[3] L.A.C. 33:III.2121 sets forth extensive, precise requirements to control fugitive emissions.

forth in 33 La. Admin. Code Pt. III, § 905 and § 2121. The factual issues raised have no bearing on whether a duty exists. Thus, Shell improperly grafts factual allegations of breach onto the element of duty, and so, Shell's argument is not persuasive.

In Evonik's motion to dismiss, Evonik argues that Plaintiff's reliance on the Environmental Regulatory Code to support her allegations of negligence "are far too vague and conclusory." (Rec. Doc. 12-1, at 14). Specifically, Evonik claims that "[b]y citing generally to the environmental code, . . . Plaintiff does not establish a statutory, jurisprudential, or other rule of law that creates a specific duty of care that Evonik owed to her, but rather asserts that the regulatory code establishes a blanket reasonableness standard with respect to emissions." (*Id.* at 13-14).

However, Evonik misrepresents Plaintiff's citations to the Louisiana Administrative Code Title 33, Part III. Plaintiff clearly cites to specific provisions, 33 La. Admin. Code Pt. III, § 905 and § 2121, which have been found to support legal duties in previous cases. In the recent state court decision, *Spencer v. Valero Refining Meraux, LLC*, the appellate court affirmed the district court's finding that the defendant refinery "had a duty to control the overall levels of air contaminants entering the surrounding area by conforming its conduct to a specific standard of care under LAC 33.III.905(A)." No. 21-3838, (La. App. 4 Cir. 2/2/22); 2022 La. App. LEXIS 157, at *7-8. Hence, state court precedent bolsters the finding that refineries and like facilities are held to a specific standard of care pursuant to the Louisiana Administrative Code Title 33, Part III.

14

Moreover, it is sufficient that Plaintiff alleges the legal standards expressed in 33 La. Admin. Code Pt. III, § 905 and § 2121 and applies the facts to the standards to render her expression of the law case-specific.[4] This is a far-cry from the *Butler* plaintiff's allegations and the allegations in the unsevered plaintiffs' original complaint that generally alluded to "unreasonably excessive emissions." Thus, the Court finds that Plaintiff articulates specific legal duties to control emissions expressed in sections of Louisiana Administrative Code Title 33, Part III, which Evonik and Shell must adhere to in operating the facility.

In sum, Plaintiff has successfully amended her complaint to allege a specific standard of care, and the Court does not dismiss her negligence claim.

### B. Breach

Next, Evonik argues that even if Plaintiff has alleged a specific duty of care, Plaintiff has failed to properly allege that Evonik breached that duty of care. (Rec. Doc. 12-1, at 15). Specifically, Evonik contends that Plaintiff does not identify any comments, findings, or information that support her conclusion that Evonik violated or otherwise failed to comply with the cited regulations. (*Id.* at 16). Plaintiff's failure to include any facts that support her inferences that Evonik was using faulty equipment or failing to comply with a leak detection program, Evonik asserts, renders her First Amended Complaint insufficient. (*Id.* at 17). In reply, Plaintiff argues that

---

[4] Plaintiff alleges, "[p]ursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at 'point sources' where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Emission controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards." (Rec. Doc. 2, 10-11).

15

she provided a sufficient factual basis to support her allegations of breach. (Rec. Doc. 13, at 15-19).

The amended complaint alleges that "Defendants have operated the facility without sufficient emissions and leak controls to reasonably limit and/or eliminate the toxic EtO" (Rec. Doc. 2, at 7). Plaintiff claims that "fugitive leaks are caused by undetected and unrepaired leaks, faulty equipment, and other negligence." (*Id.* at 8). Moreover, Plaintiff alleges that at a community outreach meeting regarding the facility's EtO emissions organized by the EPA with LDEQ,

> the EPA explained that, based on the cancer risk the facility's EtO emissions cause to the communities around it, the EPA considers the facility's emission levels to "not be sufficiently protective of human health" despite a reported reduction in emissions from 2014 to 2020. Even though the EPA advised that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards even though within permitted limits

(*Id.* at 10). Plaintiff claims that the reduction in emissions from 2014 to 2020 was "mostly attributable to the facility reducing fugitive EtO emissions *i.e.*, unplanned emissions caused by leaks in equipment, faulty processes, accidents, and other negligence," and the facility was able to reduce unplanned fugitive emissions "mostly [as] the result of improvements in the facility's mandated leak detection and repair program ("LDAR")." (*Id.*). Moreover, Plaintiff alleges that "the remaining reduction in EtO emissions was due to improvements to the operation of the facility's stack scrubber, which is the system and equipment used to control planned and known EtO emissions from the facility." (*Id.*). Finally, Plaintiff claims that, [a]ccording to the EPA, Evonik has plans to continue improving and 'enhancing' its LDAR program and

scrubber operations to reduce further fugitive and planned EtO emissions from the facility . . . " (*Id.*). Finally, Plaintiff alleges that

> Defendants failed to act reasonably and diligently in controlling planned EtO emissions from its scrubber, located at a source point, and from unplanned fugitive emissions from leaks and faulty equipment and are still taking steps to try to conform their conduct to the required standards of care to protect the public health of the Plaintiff and other residents who have lived and still live near the facility.

(*Id.* at 11). Taken together, the Court finds that the above allegations in Plaintiff's First Amended Complaint are sufficient to state a claim to relief that is plausible on its face.

### III. Nuisance

Despite the fact Judge Vance previously found that the unsevered plaintiffs properly stated a claim for nuisance in their original complaint, and amendment was unnecessary, Evonik once again argues that Plaintiff's nuisance allegations are too vague and fail to adequately support the negligence element baked into the claim.[5] However, for the second time:

> [Evonik's argument] conflates the general negligence standard under article 2315 with the distinct negligence requirement for a nuisance claim under Louisiana's vicinage articles, which deal specifically with a proprietor's relationship to his neighbors . . . [and u]nlike their article 2315 general-negligence claims, plaintiffs' nuisance claims do not require an allegation of a separate source of duty.

*Ellis v. Evonik Corp.*, 2022 U.S. Dist. LEXIS 95318, at *39-40 (E.D. La. May 27, 2022). Judge Vance thus denied in part Defendants' motion to dismiss the original plaintiffs'

---

[5] To assert a nuisance claim, a plaintiff must show that "a defendant is (1) a proprietor who (2) *negligently* (3) conducts 'work' on his property (4) that causes damage to his neighbor." *Ictech-Bendeck v. Progressive Waste Sols. Of LA, Inc.*, 2019 U.S. Dist. LEXIS 147008, at *2 (E.D. La. Aug. 29, 2019) (citing *Bd. Of Comm'rs of Se. La. Flood Prot. Auth.-E v. Tenn. Gas Pipeline Co., LLC*, 88 F. Supp. 3d 615, 643 (E.D. La. 2015)) (emphasis added).

17

nuisance claims. Here, the Court finds that Plaintiff's allegations are sufficient at the pleadings stage to support a nuisance claim. Thus, the Court declines to reverse Judge Vance's ruling.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motions to Dismiss for Failure to State a Claim* **(Rec. Docs. 4, 12)** are **DENIED**.

New Orleans, Louisiana, this 8th day of August, 2022.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE